Gideon Kracov (State Bar No. 179815)
LAW OFFICE OF GIDEON KRACOV
801 S. Grand Avenue, 11th Floor
Los Angeles, CA 90017-4645
Tel: (213) 629-2071
Fax: (213) 623-7755
Email: gk@gideonlaw.net

Attorneys for Plaintiff
CENTER FOR COMMUNITY ACTION
AND ENVIRONMENTAL JUSTICE

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL JUSTICE, a non-profit corporation,<br><br>Plaintiff,<br><br>vs.<br><br>JAMES HARDIE BUILDING PRODUCTS, INC., a corporation, DOES 1 through 10,<br><br>Defendants. | Case No. _____<br><br>COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF AND CIVIL PENALTIES<br><br>(Federal Water Pollution Control Act, 33 U.S.C. §§ 1251 to 1387) |

CENTER FOR COMMUNITY ACTION AND ENVIRONMENTAL

JUSTICE ("CCAEJ" or "Plaintiff"), a California non-profit corporation, by and

through its counsel, hereby alleges:

COMPLAINT

I.      **JURISDICTION AND VENUE**

1.      This is a civil suit brought under the citizen suit enforcement provisions of the Federal Water Pollution Control Act, 33 U.S.C. § 1251, *et seq*. (the "Clean Water Act" or "the Act").  This Court has subject matter jurisdiction over the parties and the subject matter of this action pursuant to Section 505(a)(1)(A) of the Act, 33 U.S.C. § 1365(a)(1)(A), and 28 U.S.C. § 1331 (an action arising under the laws of the United States).  The relief requested is authorized pursuant to 28 U.S.C. §§ 2201-02 (power to issue declaratory relief in case of actual controversy and further necessary relief based on such a declaration); 33 U.S.C. §§ 1319(b), 1365(a) (injunctive relief); and 33 U.S.C. §§ 1319(d), 1365(a) (civil penalties).

2.      On November 21, 2014, Plaintiff provided notice of Defendant's violations of the Act, and of its intention to file suit against Defendant, to the Administrator of the United States Environmental Protection Agency ("EPA"); the Administrator of EPA Region IX; the Executive Director of the State Water Resources Control Board ("State Board"); the Executive Officer of the California Regional Water Quality Control Board, Santa Ana Region ("Regional Board"); and to Defendant JAMES HARDIE BUILDING PRODUCTS, INC. ("HARDIE"), as required by the Act, 33 U.S.C. § 1365(b)(1)(A).  A true and correct copy of the notice letter is attached as Exhibit A, and is incorporated by reference.

3.      More than sixty days have passed since notice was served on HARDIE

1   and the State and federal agencies.  Plaintiff is informed and believes, and thereupon

2   alleges, that neither the EPA nor the State of California has commenced or is

3   diligently prosecuting a court action to redress the violations alleged in this complaint.

4

5   This action's claim for civil penalties is not barred by any prior administrative penalty

6   under Section 309(g) of the Act, 33 U.S.C. § 1319(g).

7       4.      Venue is proper in the Central District of California pursuant to Section

8

9   505(c)(1) of the Act, 33 U.S.C. § 1365(c)(1), because the source of the violations is

10  located within this judicial district.

11

12  **II.     INTRODUCTION**

13      5.      This complaint seeks relief for discharges of storm water and non-storm

14
    water pollutants from Defendant HARDIE'S industrial gas processing facility located
15

16  at 10901 Elm Avenue, Fontana, California 92337 (hereinafter "Facility") in violation

17  of the Act and National Pollutant Discharge Elimination System ("NPDES") Permit
18
    No. CA S000001, State Water Resources Control Board Water Quality Order
19

20  No. 91-13-DWQ, as amended by Water Quality Order No. 92-12-DWQ and Water

21  Quality Order No. 97-03-DWQ (hereinafter the "Permit" or "General Permit").
22

23  Defendant's failure to comply with the discharge, treatment technology, monitoring

24  requirements, and other procedural and substantive requirements of the Permit and the
25

26  Act are ongoing and continuous.

27

28

COMPLAINT

3

III.   **PARTIES**

6.     Plaintiff CCAEJ is a non-profit public benefit corporation under the laws of the State of California with its main office in Jurupa Valley, California. CCAEJ dedicated to working with communities to advocate for environmental justice and pollution prevention. CCAEJ and its members are deeply concerned with protecting the environment in and around their communities, including the Santa Ana River Watershed. To further these goals, CCAEJ actively seeks federal and state agency implementation of the Act and other laws and, where necessary, directly initiates enforcement actions on behalf of itself and its members.

7.     CCAEJ has members living in the community adjacent to the Facility and the Santa Ana River Watershed. They enjoy using the Santa Ana River for recreation and other activities. Members of CCAEJ use and enjoy the waters into which Defendant has caused, is causing, and will continue to cause, pollutants to be discharged. Members of CCAEJ use those areas to recreate and view wildlife, among other things. Defendant's discharges of pollutants threaten or impair each of those uses or contribute to such threats and impairments. Thus, the interests of CCAEJ's members have been, are being, and will continue to be adversely affected by Defendant's failure to comply with the Clean Water Act and the Permit. The relief sought herein will redress the harms to Plaintiff caused by Defendant's activities.

8.     Continuing commission of the acts and omissions alleged above will

COMPLAINT
4

irreparably harm Plaintiff and its members, for which harm they have no plain, speedy or adequate remedy at law.

9.     Plaintiff alleges on information and belief that Defendant HARDIE, INC. is a California corporation that operates the Facility in Fontana, California.

10.     Upon information and belief, and upon that basis, Plaintiff alleges that the true names, or capacities of DOES 1 through 10, inclusive (the "DOES"), whether individual, corporate, associate or otherwise, are presently unknown to PLAINTIFF, who therefore sue said Defendants by such fictitious names.  Plaintiff will amend this Complaint to show their true names and capacities when the same have been ascertained.  Whether or not HARDIE is associated with any other individual, corporate, associate or otherwise was not immediately apparent through an initial investigation completed by PLAINTIFF.

11.     HARDIE and DOES 1 through 10 are referred to collectively throughout this Complaint as Defendant or Defendants.

## IV.   STATUTORY BACKGROUND

12.     Section 301(a) of the Act, 33 U.S.C. § 1311(a), prohibits the discharge of any pollutant into waters of the United States, unless such discharge is in compliance with various enumerated sections of the Act.  Among other things, Section 301(a) prohibits discharges not authorized by, or in violation of, the terms of an NPDES permit issued pursuant to Section 402 of the Act, 33 U.S.C. § 1342.

COMPLAINT

13.    Section 402(p) of the Act establishes a framework for regulating municipal and industrial storm water discharges under the NPDES program.  33 U.S.C. § 1342(p).  States with approved NPDES permit programs are authorized by Section 402(p) to regulate industrial storm water discharges through individual permits issued to dischargers or through the issuance of a single, statewide general permit applicable to all industrial storm water dischargers.  33 U.S.C. § 1342(p).

14.    Pursuant to Section 402 of the Act, 33 U.S.C. § 1342, the Administrator of the U.S. EPA has authorized California's State Board to issue NPDES permits, including general NPDES permits, in California.

15.    The State Board elected to issue a statewide general permit for industrial storm water discharges.  The State Board issued the General Permit on or about November 19, 1991, modified the General Permit on or about September 17, 1992, and reissued the General Permit on or about April 17, 1997, pursuant to Section 402(p) of the Clean Water Act, 33 U.S.C. § 1342(p).

16.    In order to discharge storm water lawfully in California, industrial dischargers must comply with the terms of the General Permit or have obtained and complied with an individual NPDES permit.  33 U.S.C. § 1311(a).

17.    The General Permit contains several prohibitions.  Effluent Limitation B(3) of the General Permit requires dischargers to reduce or prevent pollutants in their storm water discharges through implementation of the Best Available Technology

1   Economically Achievable ("BAT") for toxic and nonconventional pollutants and the

2   Best Conventional Pollutant Control Technology ("BCT") for conventional pollutants.

3
4   BAT and BCT include both nonstructural and structural measures.  General Permit,

5   Section A(8).  Discharge Prohibition A(2) of the General Permit prohibits storm water

6
7   discharges and authorized non-storm water discharges that cause or threaten to cause

8   pollution, contamination, or nuisance.  Receiving Water Limitation C(1) of the

9   General Permit prohibits storm water discharges to any surface or ground water that

10
11   adversely impact human health or the environment.  Receiving Water Limitation C(2)

12   of the General Permit prohibits storm water discharges that cause or contribute to an

13
14   exceedance of any applicable water quality standards contained in Statewide Water

15   Quality Control Plan or the applicable Regional Board's Basin Plan.  *See Baykeeper v.*

16   *Int'l Metals Ekco, Ltd., 619 F.Supp.2d 936, 945 (C.D. Cal. 2009).*

17          18.     In addition to absolute prohibitions, the General Permit contains a variety

18
19   of substantive and procedural requirements that dischargers must meet.  Facilities

20   discharging, or having the potential to discharge, storm water associated with

21   industrial activity that have not obtained an individual NPDES permit must apply for

22
23   coverage under the State's General Permit by filing a Notice of Intent to Comply

24   ("NOI").  The General Permit requires existing dischargers to have filed their NOIs

25   before March 30, 1992.

26
27          19.     Dischargers must develop and implement a Storm Water Pollution

28

COMPLAINT

Prevention Plan ("SWPPP").  The SWPPP must describe storm water control facilities and measures that comply with the BAT and BCT standards.  The General Permit requires that an initial SWPPP have been developed and implemented before October 1, 1992.  The SWPPP must, among other requirements, identify and evaluate sources of pollutants associated with industrial activities that may affect the quality of storm and non-storm water discharges from the facility and identify and implement site-specific best management practices ("BMPs") to reduce or prevent pollutants associated with industrial activities in storm water and authorized non-storm water discharges (Section A(2)).  The SWPPP's BMPs must implement BAT and BCT (Section B(3)).  The SWPPP must include: a description of individuals and their responsibilities for developing and implementing the SWPPP (Section A(3)); a site map showing the facility boundaries, storm water drainage areas with flow pattern and nearby water bodies, the location of the storm water collection, conveyance and discharge system, structural control measures, impervious areas, areas of actual and potential pollutant contact, and areas of industrial activity (Section A(4)); a list of significant materials handled and stored at the site (Section A(5)); a description of potential pollutant sources including industrial processes, material handling and storage areas, dust and particulate generating activities, and a description of significant spills and leaks, a list of all non-storm water discharges and their sources, and a description of locations where soil erosion may occur (Section A(6)).  The

SWPPP must include an assessment of potential pollutant sources at the Facility and a description of the BMPs to be implemented at the Facility that will reduce or prevent pollutants in storm water discharges and authorized non-storm water discharges, including structural BMPs where non-structural BMPs are not effective (Section A(7), (8)). The SWPPP must be evaluated to ensure effectiveness and must be revised where necessary (Sections A(9), (10)).

20.     Section C(11)(d) of the General Permit's Standard Provisions requires dischargers to report any noncompliance to the Regional Board. *See also* Section E(6). Section A(9) of the General Permit requires an annual evaluation of storm water controls including the preparation of an evaluation report and implementation of any additional measures in the SWPPP to respond to the monitoring results and other inspection activities.

21.     The General Permit requires dischargers commencing industrial activities before October 1, 1992 to develop and implement an adequate written monitoring and reporting program no later than October 1, 1992. Existing facilities covered under the General Permit must implement all necessary revisions to their monitoring programs no later than August 1, 1997.

22.     As part of their monitoring program, dischargers must identify all storm water discharge locations that produce a significant storm water discharge, evaluate the effectiveness of BMPs in reducing pollutant loading, and evaluate whether

COMPLAINT

pollution control measures set out in the SWPPP are adequate and properly implemented. Dischargers must conduct visual observations of these discharge locations for at least one storm per month during the wet season (October through May) and record their findings in their Annual Report. Dischargers must also collect and analyze storm water samples from at least two storms per year. Section B(5)(a) of the General Permit requires that dischargers "shall collect storm water samples during the first hour of discharge from (1) the first storm event of the wet season, and (2) at least one other storm event in the wet season. All storm water discharge locations shall be sampled." Section B(5)(c)(i) requires dischargers to sample and analyze during the wet season for basic parameters, such as pH, total suspended solids, electrical conductance, and total organic content or oil & grease, certain industry-specific parameters. Section B(5)(c)(ii) requires dischargers to sample for toxic chemicals and other pollutants likely to be in the storm water discharged from the facility. Section B(5)(c)(iii) requires discharges to sample for parameters dependent on a facility's standard industrial classification ("SIC") code. Section B(7)(a) indicates that the visual observations and samples must represent the "quality and quantity of the facility's storm water discharges from the storm event." Section B(7)(c) requires that "if visual observation and sample collection locations are difficult to observe or sample…facility operators shall identify and collect samples from other locations that represent the quality and quantity of the facility's storm

water discharges from the storm event."

23.    The General Permit requires that facility operators "investigate the facility to identify all non-storm water discharges and their sources.  As part of this investigation, all drains (inlets and outlets) shall be evaluated to identify whether they connect to the storm drain system.  All non-storm water discharges shall be described. This shall include the source, quantity, frequency, and characteristics of the non-storm water discharges and associated drainage area."  Section A(6)(a)(v).  The General Permit authorizes certain non-storm water discharges providing that the non-storm water discharges are in compliance with Regional Board requirements; that the non-storm water discharges are in compliance with local agency ordinances and/or requirements; that best management practices ("BMPs") are included in the Storm Water Pollution Prevention Plan to (1) prevent or reduce the contact of non-storm water discharges with significant materials or equipment and (2) minimize, to the extent practicable, the flow or volume of non-storm water discharges; that the non-storm water discharges do not contain significant quantities of pollutants; and that the monitoring program includes quarterly visual observations of each non-storm water discharge and its sources to ensure that BMPs are being implemented and are effective (Special Conditions D).  Section B(3) of the General Permit requires dischargers to conduct visual observations of all drainage areas for the presence of non-storm water discharges, to observe the non-storm water discharges, and maintain

COMPLAINT

records of such observations.

24.     Section B(14) of the General Permit requires dischargers to submit an annual report by July 1 of each year to the executive officer of the relevant Regional Board.  The annual report must be signed and certified by an appropriate corporate officer.  Sections B(14), C(9), (10).  Section A(9)(d) of the General Permit requires the discharger to include in their annual report an evaluation of their storm water controls, including certifying compliance with the General Permit.  *See also* Sections C(9), C(10) and B(14).

25.     The General Permit does not provide for any mixing zones by dischargers.  The General Permit does not provide for any dilution credits to be applied by dischargers.

26.     The Regional Board has identified beneficial uses of the Santa Ana River Watershed and established water quality standards for the river and its tributaries in "The Water Quality Control Plan (Basin Plan) for the Santa Ana River Basin" (hereinafter "Basin Plan").  See California Regional Water Quality Control Board, Santa Ana Region, The Water Quality Control Plan (Basin Plan) for the Santa Ana River Basin (2011), available at http://www.swrcb.ca.gov/rwqcb8/water_issues/programs/basin_plan/index.shtml.

27.     The beneficial uses of these waters include, among others, municipal and domestic supply, agricultural supply, groundwater recharge, water contact recreation,

non-contact water recreation, warm freshwater habitat, cold freshwater habitat, and wildlife habitat. The non-contact water recreation use is defined as "[u]ses of water for recreational activities involving proximity to water, but not normally involving contact with water where water ingestion is reasonably possible." Id. at 3-3. These uses include, but are not limited to, picnicking, sunbathing, hiking, beachcombing, camping, boating, tidepool and marine life study, hunting, sightseeing, or aesthetic enjoyment in conjunction with the above activities." Id. Contact recreation use includes fishing and wading. Id. at 3-2. Visible pollution, including visible sheens and cloudy or muddy water from industrial areas, impairs people's use of the Santa Ana River for contact and non-contact water recreation.

28. The Basin Plan includes a narrative toxicity standard which states that "[t]oxic substances shall not be discharged at levels that will bioaccumulate in aquatic resources to levels which are harmful to human health." Id. at 4-18. The Basin Plan includes a narrative oil and grease standard which states that "[w]aste discharges shall not result in deposition of oil, grease, wax, or other material in concentrations which result in a visible film or in coating objects in the water, or which cause a nuisance or adversely affect beneficial uses." Id. at 4-15. The Basin Plan includes a narrative suspended and settleable solids standard which states that "waters shall not contain suspended or settleable solids in amounts which cause a nuisance or adversely affect beneficial uses . . . ." Id. at 4-16. The Basin Plan includes a narrative floatables

standard which states that "[w]aste discharges shall not contain floating materials, including solids, liquids, foam or scum, which cause a nuisance or adversely affect beneficial uses." Id. at 4-11.  The Basin Plan includes a narrative color standard which states that "[w]aste discharges shall not result in coloration of the receiving waters which causes a nuisance or adversely affect beneficial uses." Id. at 4-10.  The Basin Plan includes a narrative turbidity standard which states that "inland surface waters . . . shall be free of changes in turbidity which adversely affect beneficial uses." Id. at 4-18.  The Basin Plan provides that "the pH of inland surface waters shall not be raised above 8.5 or depressed below 6.5…" Id. at 4-15.

29.    The EPA has published benchmark levels as guidelines for determining whether a facility discharging industrial storm water has implemented the requisite best available technology economically achievable (hereinafter "BAT") and best conventional pollutant control technology (hereinafter "BCT").  The following benchmarks have been established for pollutants discharged by HARDIE: Total Suspended Solids (TSS) – 100 mg/L, oil and grease – 15.0 mg/L ("O&G"), pH – 6-9 s.u., and Iron (Fe) – 1.0 mg/L.  U.S. Environmental Protection Agency, Multi-Sector General Permit for Stormwater Discharges Associated with Industrial Activity (2009) 52 (hereinafter "MSGP").  *See Baykeeper v. Int'l Metals Ekco, Ltd.*, 619 F.Supp.2d 936, 945 (C.D. Cal. 2009) ("There can be no reasonable dispute that the Benchmarks are relevant to the inquiry as to whether a facility implemented BMPs");

COMPLAINT

*Waterkeepers Northern California v. AG Industrial Mfg. Inc.*, 375 F.3d 913, 919 n.5 (9th Cir. 2004) (plaintiff appropriately pointed to EPA benchmark values "as evidence to support its claim that [the defendant] failed to implement adequate BMPs");

30.     Section 505(a)(1) and Section 505(f) of the Act provide for citizen enforcement actions against any "person," including individuals, corporations, or partnerships, for violations of NPDES permit requirements.  33 U.S.C. §§1365(a)(1) and (f), § 1362(5).  An action for injunctive relief under the Act is authorized by 33 U.S.C. § 1365(a).  Violators of the Act are also subject to an assessment of civil penalties of up to $32,500 per day per violation for all violations occurring through January 12, 2009, and $37,500 per day per violation for all violations occurring after January 12, 2009, pursuant to Sections 309(d) and 505 of the Act, 33 U.S.C. §§ 1319(d), 1365.  *See also* 40 C.F.R. §§ 19.1 - 19.4.

## V.     STATEMENT OF FACTS

31.     In its NOI, HARDIE certified that the Facility is classified under SIC Code 3272 (Concrete and Gypsum Products). HARDIE is a fiber-cement product company, specializing in lap sidings, vertical sidings, shingles, panels, pipes, and ceramic tile backer boards. On information and belief, CCAEJ alleges that the 20-acre Facility collects and discharges storm water from its industrial site into five or more storm drain outfalls located at the Facility.  The outfalls discharge into San Bernardino County's municipal storm sewer system, which flows into Declez Channel, which

flows into the Santa Ana River.

32.     On information and belief, Plaintiff alleges that the management practices at the Facility do not prevent the sources of contamination described above from causing the discharge of pollutants to waters of the United States.

33.     Since at least January 26, 2010, HARDIE has taken samples or arranged for samples to be taken of storm water discharges at the Facility.  The sample results were reported in the Facility's annual reports submitted to the Regional Board. HARDIE certified each of those annual reports pursuant to Sections A and C of the General Permit.

34.     Since at least January 26, 2010, the Facility has detected pH, TSS and iron, in storm water discharged from the Facility. Levels of pH detected in the storm water have been outside of the parameters for water quality standards in violation of the Basin Plan.  Levels of these pollutants detected in the Facility's storm water have been in excess of EPA's numeric parameter benchmark values.  As detailed in the notice letter attached as Exhibit A and fully incorporated herein, the following dates contained concentrations of pollutants in excess of the numeric water quality standards and/or narrative water quality established in the Basin Plan: April 25, 2014, February 6, 2014, May 6, 2013, April 1, 2013, January 25, 2013, November 8, 2012, October 11, 2012, December 20, 2011, October 7, 2011 and January 26, 2010.  This information reflects data gathered from HARDIE's self-monitoring during the 2010-

2011, 2011-2012, 2012-2013 and 2013-2014 wet seasons.

35.     Discharges on the following dates at multiple outfalls from the Facility contained concentrations of pollutants in excess of the numeric EPA water quality benchmarks: April 25, 2014, February 6, 2014, May 6, 2013,  October 11, 2012, February 10, 2012, December 12, 2011, and January 30, 2010 for pH, TSS and/or iron This information in reflects data gathered from HARDIE's self-monitoring during the 2010-2011, 2011-2012, 2012-2013 and 2013-2014 wet seasons.

36.     The level of TSS in storm water detected by the Facility has exceeded the benchmark value for TSS of 100 mg/L established by EPA.   For example, on May 6, 2013, 800 mg/L was measured in outfall location #2.

37.     The level of iron in storm water detected by the Facility has exceeded the benchmark value of 1.0 mg/L established by EPA.  For example, on May 6, 2013, 140.0 mg/L was measured in outfall location #1.

38.     The level of pH in storm water detected by the Facility has exceeded the benchmark value of 6-9 s.u. established by EPA.  For example, on May 6, 2013, 9.8 s.u. was measured in outfall location #1.

39.     CCAEJ also alleges on information and belief that HARDIE failed to conduct visual observations in November 2009, March 2010, April 2010, April 2011, November 2011, January 2012, March 2013, October 2013, November 2013, December 2013, and March 2014 claiming that there were no qualifying rain events

1    when in fact there were numerous such events during these periods.

2        40.    On information and belief, Plaintiff alleges that since at least January 23,

3, 4   2010, Defendants have not implemented BAT and BCT at the Facility for discharges

5    of pH, TSS, iron, and other pollutants.  Section B(3) of the General Permit requires

6, 7   that Defendants implement BAT for toxic and nonconventional pollutants and BCT

8    for conventional pollutants by no later than October 1, 1992.  As of the date of this

9    Complaint, the Facility has not implemented BAT and BCT.

10, 11   41.    On information and belief, Plaintiff alleges that since at least January 23,

12    2010, Defendants did not implement an adequate Storm Water Pollution Prevention

13    Plan for the Facility.  Plaintiff is informed and believes, and thereupon alleges, that the

14, 15   SWPPP prepared for the Facility does not set forth site-specific best management

16    practices for the Facility that are consistent with BAT or BCT for the Facility.

17, 18   Plaintiff is informed and believes, and thereupon alleges, that the SWPPP prepared for

19    the Facility does not include an adequate assessment of potential pollutant sources,

20    structural pollutant control measures employed, a list of actual and potential areas of

21, 22   pollutant contact, or an adequate description of best management practices to be

23    implemented at the Facility to reduce pollutant discharges.  Plaintiff is informed and

24, 25   believes, and thereupon alleges, that the SWPPP does not include each of the

26    mandatory elements required by Section A of the General Permit.

27        42.    Information available to Plaintiff indicates that as a result of these

28

practices, storm water containing excessive pollutants is being discharged during rain events from the Facility directly to the County of San Bernardino storm drain system, which discharges to the Santa Ana River.

43.     Plaintiff is informed and believes that Defendants did not submit to the Regional Board, since at least January 23, 2010, an annual report, that is signed and certified by the appropriate corporate officer, outlining the Facility's storm water controls and accurately certifying compliance with the General Permit Pursuant to Sections A(9)(d), B(14), and C(9), (10) of the General Permit.

44.     Information available to Plaintiff indicates that Defendants have not fulfilled the requirements set forth in the General Permit for discharges from the Facility due to the continued discharge of contaminated storm water.  Plaintiff is informed and believes, and thereupon alleges, that all of the violations alleged in this Complaint are ongoing and continuing.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**Implement the Best Available and**
**Best Conventional Treatment Technologies**
**(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

45.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

46.     The General Permit's SWPPP requirements and Effluent Limitation B(3) require dischargers to reduce or prevent pollutants in their storm water discharges

COMPLAINT

19

through implementation of BAT for toxic and nonconventional pollutants and BCT

for conventional pollutants.  Defendants have not implemented BAT and BCT at the

Facility for discharges of pH, TSS, iron, and other pollutants in violation of Effluent

Limitation B(3) of the General Permit.

47.     Each day, since January 23, 2010, that Defendants did not develop and

implement BAT and BCT in violation of the General Permit is a separate and distinct

violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

48.     Defendants have not complied with the BAT/BCT requirements every day

since January 23, 2010.  Defendants continue to not comply with the BAT/BCT

requirements each day that they fail to develop and fully implement BAT/BCT at the

Facility.

### SECOND CAUSE OF ACTION
**Discharges of Contaminated Storm Water
in Violation of Permit Conditions and the Act
(Violations of 33 U.S.C. §§ 1311, 1342)**

49.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if

fully set forth herein.

50.     Discharge Prohibition A(2) of the General Permit requires that storm water

discharges and authorized non-storm water discharges shall not cause or threaten to

cause pollution, contamination, or nuisance.  Receiving Water Limitations C(1) and

C(2) of the General Permit require that storm water discharges and authorized non-

storm water discharges shall not adversely impact human health or the environment,

COMPLAINT

and shall not cause or contribute to a violation of any water quality standards contained in a Statewide Water Quality Control Plan or the applicable Regional Board's Basin Plan.

51.     Plaintiff is informed and believes, and thereupon alleges, that since at least January 23, 2010, Defendants have discharged polluted storm water from the Facility in excess of applicable water quality standards in violation of the Discharge Prohibition A(2) of the General Permit.

52.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are causing or contributing to the violation of the applicable water quality standards in a Statewide Water Quality Control Plan and/or the applicable Regional Board's Basin Plan in violation of Receiving Water Limitation C(2) of the General Permit.

53.     Plaintiff is informed and believes, and thereupon alleges, that these discharges of contaminated storm water are adversely affecting human health and the environment in violation of Receiving Water Limitation C(1) of the General Permit.

54.     Every day, since at least January 23, 2010, that Defendants have discharged and continue to discharge polluted storm water from the Facility in violation of the General Permit is a separate and distinct violation of Section 301(a) of the Act, 33 U.S.C. § 1311(a).  These violations are ongoing and continuous.

## **THIRD CAUSE OF ACTION**

**Prepare, Implement, Review, and Update
an Adequate Storm Water Pollution Prevention Plan
(Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

55.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

56.     Section A and Provision E of the General Permit requires dischargers of storm water associated with industrial activity to develop and implement an adequate SWPPP no later than October 1, 1992.

57.     Defendants have not developed and implemented an adequate SWPPP for the Facility.

58.     Each day since January 23, 2010, that Defendants do not develop, implement and update an adequate SWPPP for the Facility is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).

59.     Defendants have been in violation of the SWPPP requirements every day since January 23, 2010.  Violation continues each day that an adequate SWPPP for the Facility is not developed and fully implemented.

**FOURTH CAUSE OF ACTION**
**Develop and Implement an
Adequate Monitoring and Reporting Program
(Violation of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)**

60.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

61.     Section B of the General Permit requires dischargers of storm water associated with industrial activity to have developed and be implementing a

COMPLAINT

monitoring and reporting program (including, *inter alia*, sampling and analysis of discharges) no later than October 1, 1992.

62.     Defendants have not developed and implemented an adequate monitoring and reporting program for the Facility.  Defendants' ongoing lack of an adequate monitoring and reporting program is evidenced by, *inter alia*, the Facility's failure to conduct visual observations as set forth above.

63.     Each day since January 23, 2010, that Defendants did not develop and implement an adequate monitoring and reporting program for the Facility in violation of the General Permit is a separate and distinct violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).  The absence of requisite monitoring and analytical results are ongoing and continuous.

## FIFTH CAUSE OF ACTION
### Certification of Compliance in Annual Report
### (Violations of Permit Conditions and the Act, 33 U.S.C. §§ 1311, 1342)

64.     Plaintiff re-alleges and incorporates all of the preceding paragraphs as if fully set forth herein.

65.     Defendants have not accurately certified compliance with the General Permit in each of the annual reports submitted to the Regional Board since at least January 23, 2010.

66.     Each day since at least January 23, 2010, that Defendants do not accurately certify compliance with the General Permit is a separate and distinct

violation of the General Permit and Section 301(a) of the Act, 33 U.S.C. § 1311(a).
Defendants continue to be in violation of the General Permit's certification requirement
each day they maintain an inaccurate certification of its compliance with the General
Permit.

## **RELIEF REQUESTED**

Wherefore, Plaintiff respectfully requests that this Court grant the following
relief:

a.  Declare Defendants to have violated and to be in violation of the Act as
alleged herein;

b.  Enjoin Defendants from discharging polluted storm water from the
Facility unless authorized by the Permit;

c.  Enjoin Defendants from further violating the substantive and
procedural requirements of the Permit;

d.  Order Defendants to immediately implement storm water pollution
control and treatment technologies and measures that are equivalent to BAT or BCT
and prevent pollutants in the Facility's storm water from contributing to violations of
any water quality standards;

e.  Order Defendants to comply with the Permit's monitoring and
reporting requirements, including ordering supplemental monitoring to compensate for
past monitoring violations;

COMPLAINT

f.   Order Defendants to prepare a SWPPP consistent with the Permit's requirements and implement procedures to regularly review and update the SWPPP;

g.   Order Defendants to provide Plaintiff with reports documenting the quality and quantity of their discharges to waters of the United States and their efforts to comply with the Act and the Court's orders;

h.   Order Defendants to pay civil penalties of $37,500 per day per violation for all violations pursuant to Sections 309(d) and 505(a) of the Act, 33 U.S.C. §§ 1319(d), 1365(a) and 40 C.F.R. §§ 19.1 - 19.4;

i.   Order Defendants to take appropriate actions to restore the quality of waters impaired or adversely affected by their activities;

j.   Award Plaintiff's costs (including reasonable investigative, attorney, witness, compliance oversight, and consultant fees) as authorized by the Act, 33 U.S.C. § 1365(d); and,

k.   Award any such other and further relief, as this Court may deem appropriate.

Dated: ___1/23___, 2015

Respectfully submitted,

By: _____

Gideon Kracov
Attorneys for Plaintiff